## William A. Pungs v. American Brake Beam Co.

1. CONSTRUCTION OF CONTRACTS—*Private Rights Prevail over the Rights of the Public in Doubtful Cases.*—In the construction of contracts the rights of the individual in mere private contracts should, as a general rule, prevail over the rights of the public in doubtful cases.

2. SAME—*When Not to be Held Void.*—Before a contract should be held void, as contrary to law or public policy, it should appear clearly so, and beyond reasonable controversy.

3. INSTRUCTIONS—*To be Considered as a Series.*—It is well settled that the instructions in a given case must be considered as a series, and if, when so considered, they fully and fairly instruct the jury as to every material fact in controversy, they will be considered as sufficient.

4. INTEREST—*When Properly Allowable, Under the Statute, on Money Paid Out.*—Interest is properly allowable on money paid out, under the statute. (R. S., Chap. 74, Sec. 2.)

**Action on the Case.**—Appeal from the Circuit Court of Cook County; the Hon. EDMUND W. BURKE, Judge presiding. Heard in this court at the October term, 1901. Affirmed. Opinion filed May 5, 1902.

**Statement by the Court.**—This is an action on the case by appellee as plaintiff against appellant as defendant, the declaration as amended consisting of fifteen counts, all of which charge that appellant, at different periods in the year 1892 to the year 1897, both inclusive, was the agent manager and superintendent for plaintiff in its business of manufacturing, and it seeks to recover from defendant under the first, second and fifteenth counts (the latter count being also termed an additional count) for certain profits or overcharges on certain sheets of rolled steel purchased by the plaintiff of the Michigan Railway Supply Co. through the defendant, who was then the treasurer and general manager of said supply company; under the third and fourth counts certain profits or commissions alleged to have been received by defendant, particularly on the purchase of 500 tons of steel from the Wheeling Steel & Iron Co. through defendant; under the fifth and sixth counts for an alleged loss of the plaintiff on account of 3,740 brake beams which it is claimed were defectively manufactured for plaintiff under the defendant's superintendence; under the seventh count for the sum of $325 claimed to have been paid by plaintiff on account of 1,300 No. 3 " Christie " special heads for use on said brake beams, claimed to have been defectively manufactured; and under the twelfth count for the sum of $46 of plaintiff's money alleged to have been used by defendant to pay his own private bill.

The eighth, ninth, tenth and eleventh counts need not be stated, since any recovery under them is eliminated by a remittitur from the verdict made by the plaintiff. The court charged the jury there could be no recovery under the thirteenth and fourteenth counts, and they are therefore not stated.

The plea was the general issue. A trial before the court and a jury resulted in a verdict for the plaintiff of $10,292.32, from which, pending a motion for a new trial, the plaintiff remitted the sum of $4,142.69, which, as appears from the bill of exceptions, includes the amount of plaintiff's claims, made under the eighth, ninth, tenth and eleventh counts of the declaration and interest thereon. After the remittitur judgment was entered on the verdict for $6,149.63, from which this appeal is taken.

From the evidence it appears that defendant was general manager of plaintiff from its organization in the year 1892 until March 6, 1894, and that during this period defendant paid a bill to a firm of patent attorneys, Parker & Burton, for services rendered by them for defendant regarding a certain patent device which defendant claimed to have purchased from plaintiff for use in its business. The evidence regarding the item is conflicting, but we think the preponderance of the evidence is that this amount was paid out of plaintiff's money on a matter purely private to the defendant.

The plaintiff, through its manager, Henry D. Laughlin, entered into an agreement with the defendant, dated November 25, 1895, which, omitting the formal commencement and conclusion, is as follows:

" Whereas, the Michigan Railway Supply Co., of which said Pungs is the general manager, and the American Brake Beam Co., are now, and for some time have been, endeavoring to consummate a sale from said Supply Co. to said Brake Beam Co. of the special machinery now owned by the Supply Co. and now situated in its factory or plant at Detroit with which the Central steel brake beam has heretofore been manufactured by it for said Brake Beam Co.; and

Whereas, a draft of the proposed contract between said companies was drawn and submitted to said Pungs in the month of October last, which as yet has not been executed, said Pungs having objections to some of its provisions; and

Whereas, by one of the provisions of said proposed contract said Supply Co. is to lease to said Brake Beam Co. a portion of its plant located at Detroit, in which said machinery is now erected and in use, the lease to run to and until January 1, 1897; and

Pungs v. American Brake Beam Co.

Whereas, it is within the power of said Pungs, as general manager of said Supply Co., to utilize the waste material necessarily incident to the manufacture of said Central steel brake beam by manufacturing this into washers and nuts, and thus to save this waste without loss, said Supply Co. being willing to take this waste at the request of Pungs, in payment of the cost of manufacturing beams, and the incidental or other expensès connected with the manufacture thereof at said Detroit plant; and

Whereas, it is known that the loss of this waste material is in excess of ten cents on each brake beam; and

Whereas, said Pungs is unwilling, either as an officer or shareholder of said Supply Co., to enter into said contract or to permit said Supply Co. so to do, unless a satisfactory arrangement is made with him by the Brake Beam Co. touching this waste material, and his superintendence of the manufacturing of the beams at the plant of said Supply Co.; and

Whereas, said Brake Beam Co. holds the note in the sum of $10,000, made by said Pungs and dated March 5, 1894, together with the collateral attached thereto;

Now, therefore, the premises considered, it is agreed by and between Pungs, on the one part, and the Brake Beam Co., on the other, as follows:

First. It is the obligation of Pungs to deliver to the Brake Beam Co. at said Detroit plant, whenever, and as requested, at least as many as 10,000 sheets of rolled steel of the required dimensions, with which, in part, to manufacture brake beams, the weight of each sheet for freight beams being, approximately, fifty-nine pounds, and for locomotive and passenger beams sixty-nine pounds; and he shall do this at the price of $1.30 per hundred pounds for the freight beams and $1.40 per hundred pounds for the locomotive and passenger beams. If it be within his power to increase this quantity at these rates, and it be the desire of the Brake Beam Co. to have him do so, he will increase the quantity; but it shall not be his obligation under the contract to actually furnish more than 10,000 sheets; this steel to be paid for thirty days from date of invoices.

Second. Pungs undertakes to superintend the manufacture of such of said brake beams as may be manufactured by or for the Brake Beam Co. at said plant in Detroit between the date of this contract and January 1, 1897, and will save the Brake Beam Co. all expense connected with the manufacture of the beams, save and excepting the cost of material and the rent which it will pay to the Michigan Railway Supply Co.

Third.   In addition to superintending the manufacture of said beams, and the machinery of the Brake Beam Co., at Detroit, he will, so long as this contract continues, render such assistance to the management of the Brake Beam Co. as may be requested or required by them to provide the necessary material on the best terms possible for the Brake Beam Co., as well as whatever may be necessary to promptly and efficiently fill all orders for the brake beams directed by the Brake Beam Co. to be filled at said plant. He will maintain the present high standard of workmanship and material employed in the manufacture of the beam, and will not use, nor suffer to be used, any material therein which is not first approved or authorized by the management of the Brake Beam Co., and the compensation herein referred to shall be in full of all services rendered to the Brake Beam Co. in and about the premises.

Fourth.   He will secure for the Brake Beam Co. the right to supply metal brake beams for any business secured by the Brake Beam Co. in the Dominion of Canada, free of cost or royalty to the Brake Beam Co., all such beams, however, to be manufactured in the United States.

Fifth.   Pungs reserves the right to terminate this contract at any time by giving ten days' written notice of his intention so to do, and unless terminated by his death or voluntary act prior to its expiration, it shall continue to and until January first, 1897.

Sixth.   In consideration of the undertakings of said Pungs and as compensation for his services to be rendered under this contract, the Brake Beam Co. will pay to him as hereinafter provided an amount equal to said $10,000 note and interest, accrued and accruing, to January 1, 1897. The principal and interest of this note at that date will be $11,411.08.   By this is meant that it will pay to him at the rate of $11,411.08 for the whole term by crediting his account on the company's books monthly for the fourteen months included in term, and at the end of each month, beginning November 30, 1895, with the sum of $15.08, so that at the end of the term, unless the contract is sooner terminated, his aggregate credit on the books of the company will be $11,411.08, and when his credit shall thus equalize the amount of said note and interest, the Brake Beam Co. will return to him the said note with the collateral attached, and he will receipt to the company for the amount of his credit, the note in that case being given in payment of the credit.   If the contract be terminated prior to January 1, 1897, the amount at the date of its termina-

tion to the credit of Pungs on the books of the company shall be applied as a credit on the note and treated as paid the Brake Beam Co. on account thereof; and the balance in that case shall be payable by Pungs to the company. If the contract is terminated by the death of Pungs, or by his voluntary act, prior to its expiration, but after he has furnished the sheet steel herein referred to, he shall be entitled to a credit on account of this item in an amount equal to the difference between the prices herein named and the market prices of the material at the dates of the delivery, less as many fourteenths of this sum as have at that time been already credited to him in his monthly credits. So that in the adjustment of the accounts between Pungs and the company, he shall be entitled, if this adjustment is had prior to the expiration of the contract, to full credit for what has been saved to the Brake Beam Co. on account of this material up to 10,000 sheets, and if the accounting be had at the expiration of the contract, he having lived up to it through the whole term, he shall be entitled to the total credit of $11,411.08 and no more. If by his voluntary act Pungs terminates this contract before its expiration, he will place the machinery and business then being managed by him in charge of such person as the Brake Beam Co. may at the time name, and will give to such persons such information as he may be able, to facilitate the continuance of the business and its management by his successor.

This contract is made subject to the contingency that a contract for the sale of said brake beam machinery from said Supply Co. to said Brake Beam Co. is entered into within ten days and is carried into effect within thirty days from this date."

Under the same date and as part of the same transaction, the plaintiff, by said Laughlin, its general manager, and the Michigan Railway Supply Co., by said defendant, its general manager, entered into an agreement by which the Supply Co. agreed to sell and the Brake Beam Co. agreed to buy all the special machinery owned or used by the Supply Co. for the manufacture of what was known as the Central Steel Brake Beam, then in its factory or plant in Detroit, Michigan, upon certain terms and conditions therein specified; also the Supply Co. by the agreement leased to the Beam Co. whatever of the Supply Co.'s plant, building and appurtenances in which said machinery was located, as

might be necessary for the efficient and successful manufacture, sale and delivery of said brake beams, upon terms in the agreement specified in detail; also the Supply Co., by the agreement, undertook to manufacture for the Beam Co. all such Central Steel Brake Beams as by the latter company might be requested, until the first day of January, 1897, the agreement specifying in detail as to how the manufacture should be conducted and the material therefor and the expense thereof paid.

This agreement also provides that it is " made subject to the approval of the boards of directors of the companies themselves, and when approved by the respective boards of directors, it shall be treated as final and conclusive."

Subsequently, on December 2, 1895, both these contracts were ratified by the respective boards of directors of the two companies. Afterward, under date of January 1, 1897, there was entered into between the plaintiff, by said Laughlin, its general manager, and said defendant, another contract, which, omitting the formal commencement and conclusion, is as follows :

" In consideration of the undertakings of Pungs, the Brake Beam Company employs him for the year 1897 (subject to the terms and conditions of this contract) to superintend at Detroit the manufacture of the brake beams which it may manufacture or cause to be manufactured at that point, as well as the operation of its machinery and plant for that purpose, and also to assist it in conducting its business at that point in such manner and to such extent as may be desirable to it, and said Pungs accepts of such employment.

The compensation to be paid by the Brake Beam Company to Pungs for his services shall be at the rate of five thousand dollars ($5,000) per annum in equal monthly installments of $416.66, payable at the end of each month.

Pungs undertakes to superintend the manufacture and shipment of such brake beams as may be manufactured by or for the Brake Beam Company at Detroit, between the date of this contract and January 1, 1898, and to cause the work to be done efficiently, promptly and to the satisfaction of the Brake Beam Company, and at the least possible cost to it, and he will transact the business in the manner required

by the Brake Beam Company.   In addition to the superintending the manufacture and shipment of its beams, and the machinery and plant of the Brake Beam Company at Detroit, and the transaction of such business as may be necessary as an incident thereto, he will, so long as this contract continues, render such assistance to the management of the brake beams as may be requested or required by them, to provide the necessary material on the best terms possible for the Brake Beam Company, as well as whatever may be necessary to promptly and efficiently fill all orders for brake beams directed by the Brake Beam Company to be filled at Detroit.   He will maintain the present high standard of workmanship and material employed in the manufacture of the beams, and will not use or suffer to be used any material therein which is not first approved or authorized by the management of the Brake Beam Company; and the compensation herein referred to shall be in full of all service rendered to the Brake Beam Company in and about the premises.   He will also secure for the Brake Beam Company the right to supply metal brake beams for any business secured by the Brake Beam Company in the Dominion of Canada, in which the central steel brake beam is to be used, free of cost, or royalty to the Brake Beam Company; all such beams, however, to be manufactured in the United States.

Pungs reserves the right to terminate this contract at any time by giving ten days written notice of his intention so to do, and unless terminated by his voluntary act, or by his death, prior to its expiration, it shall continue to and until January 1, 1898.   If, however, it be terminated either by his voluntary act or by his death prior to January 1, 1898, his compensation shall be calculated and paid to the time of its termination, and from that time forward no further claim shall be made by him or others claiming through him."

This contract was also ratified by the board of directors of the plaintiff company, and the defendant acted under it with the knowledge and consent of the Supply Company. At the same time this contract was made, another contract was entered into by said two companies, by their said respective general managers, of the same general import as their contract of November 25, 1895, leasing the plant of the Supply Co. to the Beam Co., and providing various terms and conditions under which their respective businesses should

be conducted at the same place as under their former contract.

About the time of the making of the contract of November 25, 1895, the defendant began to act in the superintendence of the manufacture of brake beams for the plaintiff at Detroit, Michigan, and continued in its employ in that capacity up to the 1st day of January, 1897, and thereafter he continued said employment under said contract of January 1, 1897, until the 5th day of September, 1897, when, differences having arisen between him and the plaintiff company, he was discharged.

Between November 25, 1895, and September 5, 1897, while appellant was acting as the agent and manager of appellee, the various transactions, except said item of $46, occurred, by reason of which it is claimed by appellee it is entitled to recover from appellant under the several counts of the declaration hereinabove specified, except under the 12th count, which relates to the $46. As to all these matters the evidence presents a conflict which will be more specifically referred to in the opinion which follows this statement.

At the close of the plaintiff's evidence, the defendant asked that the jury be instructed to find a verdict in his favor, which was overruled. The motion was renewed at the close of all the evidence, again overruled, and in each instance an exception was preserved.

Among other instructions asked and given on behalf of the plaintiff, of which complaint is made, are the following, to wit :

" 3.    You are further instructed that if you find that the written instrument dated January 1, 1897, and offered in evidence as a contract between the plaintiff and the defendant for that year, was executed by the parties and was approved by the board of directors of the plaintiff, then you are instructed that it was the duty and obligation of the defendant under such contract to provide such steel as might be requested or required by the plaintiff in the manufacture of brake beams on the best terms possible for the plaintiff; and if you find from the evidence that the defendant, while acting under this contract as the agent of the plaintiff, purchased steel for a certain price, and had the same

charged or billed to the plaintiff at a higher price and thereby caused the plaintiff to pay or incur an obligation to pay said higher price, then you are instructed that the defendant was guilty of a breach of duty he owed to the plaintiff in this regard, and on this issue your verdict should be in favor of the plaintiff.

" 4. You are further instructed that if you find that the written instrument offered in evidence as the contract of January 1, 1897, between the plaintiff and defendant, was executed by the parties and approved by the board of directors of the plaintiff company, then such instrument constituted a binding contract between the parties for the purposes therein mentioned, and it became and was the defendant's duty and obligation to superintend the manufacture and shipment of such brake beams as were manufactured by or for the plaintiff at Detroit, Michigan, during the year 1897, and to cause the work to be done efficiently, promptly and to the satisfaction of the plaintiff, and if he failed to do so, and if you find from the evidence that by defendant's failure to so perform his duty in that behalf, any brake beams were not, between January 1, 1897, and September 5, 1897, manufactured to the satisfaction of the plaintiff, or were defectively manufactured, and rendered unfit for brake beams, and that the plaintiff suffered loss or damage thereby, then you are instructed that on this issue the defendant is guilty as alleged by the plaintiff, and your verdict must be for the plaintiff on this issue.

" 5. You are further instructed, if you find that the written instrument offered in evidence as the contract of January 1, 1897, between the plaintiff and defendant as executed by the parties and approved by the board of directors of the plaintiff company, then such instrument constituted a binding contract between the parties for the purposes therein mentioned, and it was the defendant's duty and obligation thereunder to superintend the manufacture and shipment of such brake beams as should be manufactured by or for the plaintiff at Detroit, Mich., during the year 1897, to cause the work to be done efficiently, promptly and to the satisfaction of the plaintiff, and if he failed so to do, and if you find from the evidence that by defendant's failure to perform his duty in that behalf, any brake beams were not, between January 1, 1897, and September 5, 1897, manufactured to the satisfaction of the plaintiff, or were defectively manufactured and rendered unfit for brake beams, and that the defendant, without

instructions from the plaintiff and against its desires and instructions, procured to be manufactured thirteen hundred (1300) special heads to fit said brake beams, if any so defectively manufactured, by reason whereof the cost of the manufacture of said special heads was lost to the plaintiff, then you are instructed that on this issue the defendant is guilty of wrongful conduct and breach of duty as alleged, and your verdict as to this should be for the plaintiff.

" 7.    The jury are further instructed by the court that if they find from the evidence that the defendant is guilty, under any of the issues herein, and that the plaintiff was required to and did pay out money through the wrong or fraud of the defendant, it will be the duty of the jury to find from the evidence the amount of money so paid out by the plaintiff, and the date when the same was so paid; and the jury will include in their verdict such sum so paid, if they find it was paid out through the fraud or the wrongful acts of the defendant; and also include in the verdict interest on such sum, so found to have been so paid, at the rate of five (5) per cent per annum from the date of such payment by the plaintiff until to-day."

Complaint is made of other instructions given on behalf of plaintiff, which we deem it unnecessary to set out; also of various rulings of the court upon the admission and exclusion of evidence, to which reference is made in the opinion which follows.

CHARLES R. WHITMAN and DWIGHT C. REXFORD, attorneys. for appellant.

FRANCIS A. RIDDLE and SHOPE, MATHIS, ZANE & WEBER, attorneys for appellee.

MR. PRESIDING JUSTICE WINDES delivered the opinion of the court.

The principal contest in this case is made upon the contract between appellee and appellant set out in the statement, and as to the transactions had under said contracts, the only other item being that of $46, which the appellee claims was wrongfully paid out of its money by appellant on a private matter of his own.

As to this item of $46, it seems sufficient to say that we have examined the evidence pertaining to it, which appears to be conflicting, but is sufficient, in our opinion, to justify a verdict for the plaintiff including that amount.

As to the contracts dated November 25, 1895, and January 1, 1897, above referred to, the first claim of appellant is that they are illegal and void, as being against public policy. Numerous decisions are cited in support of the contention, but we think none of them are directly applicable to the facts of this case. They relate, in so far as they may have a bearing on this question, to secret interests or profits or advantages to be derived by an officer of or stockholder in a corporation, in corporate contracts, or to persons acting in a public capacity, and not to cases like this, where the corporation whose officer, the appellant, made these contracts, which were either approved directly through its board of directors, or the corporation permitted him to act thereunder, with full knowledge of all the facts relating thereto.

Appellant's counsel, in their argument, based their claim as to the illegality of the first contract upon the fact that by its recitals it was not to become operative unless another contract satisfactory to appellee was entered into for the sale by the Supply Co. to appellee of its brake beam machinery, and because the large salary which it gives to appellant was an inducement to him to use his influence in his capacity as officer, stockholder and director of the Supply Co., to bring about the execution by that company of the contract between it and the appellee. Certainly these matters would be of the greatest importance to the Supply Co. in entering into its contract to sell its machinery to the appellee, and it might well be, under the authorities cited and relied upon by appellant, that his contract to act as superintendent for appellee would be void, had it been kept secret by appellant from the Supply Co. The evidence shows that at the time of the making of this contract the appellant was the general manager and director of and stockholder in the Supply Co., and that the business rela-

tions between it and the appellee company were very close, the appellant having theretofore acted as agent of the appellee company, and it was the desire of the Supply Co. to dispose of its brake beam machinery to the appellee, lease a portion of the Supply Co.'s factory to the appellee, manufacture brake beams for it, and at the same time utilize all the waste material (which was quite considerable) in the manufacture of the beams, in the business of the Supply Co. In view of all these matters and of the fact that the Supply Co., by its board of directors, approved of both the contracts of date November 25, 1895, we think the appellant's contract of that date with appellee was a valid and binding contract upon him. The Supply Co. is not complaining, and the appellant should not be heard to question the validity of the contract. Dexter v. McClelland, 116 Ala. 37–49; 1 Beach on Contr., Sec. 717.

Moreover, this contract relates to merely private matters which concern only the two corporations and the appellant, and in no way relate to any public interest. So long as all the parties interested acted under the contracts with full knowledge of all the facts, it is doubtful, to say the least, whether any matter of public interest is at all involved. That being so, the contract should rather receive that interpretation which would make it binding upon the parties, than one which would render it invalid. The rights of the individual in mere private contracts should, as a general rule, prevail over the rights of the public in doubtful cases. 1 Chitty on Contrs. (11th Amer. Ed.), 112; 1 Beach on Mod. Law of Contrs., Sec. 717, and cases cited; Barrett v. Carden, 65 Vt. 431, and cases cited; Shreffler v. Nadelhoffer, 133 Ill. 536–55; Houlton v. Nichol, 93 Wis. 393; Thompson v. Seavor, 91 Ill. App. 500, and cases cited; affirmed 189 Ill. 159.

Before a contract should be held to be void, as contrary to law or a sound public policy, it should be made to appear clearly—beyond reasonable controversy.

The contract of January 1, 1897, between the appellee and the appellant, as well as the contract of the same date

between the Supply Co. and the appellee, was made upon the same lines as the other two contracts above referred to, of November 25, 1895.   While no express ratification of the latter two contracts was made by the Supply Co., the salary of the defendant, by his contract of January 1, 1897, is less than one-half of what the appellee agreed to pay him for like services under the contract of November 25, 1895.   The contract of January 1, 1897, between the Supply Co. and the appellee, seems to be in the interest of the Supply Co., and the same intimate business relations between the two companies as under the former contract appear to be continued by this new contract.   The two companies, as appears from the evidence, acted under this latter contract, and the Supply Co., all the time during the existence of the appellant's contract with the appellee, dated January 1, 1897, knew of appellant's relations to and his employment by the appellee.   In fact it appears from the record that counsel for appellant on the trial offered to concede that the contracts of November 25, 1895, were ratified by the two companies, provided that was coupled with a statement that the contract of January 1, 1897, was also ratified by the two companies.

In view of all these matters, we think that appellant's contract with appellee of January 1, 1897, is valid and binding.

The next contention of appellant is that, conceding the validity of the contract of November 25, 1895, still the overcharge amounts for sheets of rolled steel claimed by appellee only amount to $456.64, instead of $1,312.50.   If appellant's construction of this contract were the correct one, his computation as to the overcharges would probably be about the correct figure.   His claim is that under that contract he was only bound to furnish 10,000 sheets of steel. A reading of the first division of that contract, in the light of the evidence, as we think, demonstrates that this construction of the contract is not the correct one.   The latter part of this provision is as follows:

" If it be within his power to increase this quantity at

these rates, and it be the desire of the Brake Beam Company to have him do so, he will increase the quantity, but it shall not be his obligation under the contract to actually furnish more than 10,000 sheets; this steel to be paid for thirty days from date of invoices."

The evidence shows that the appellant actually undertook to furnish and did furnish about 20,000 sheets of steel at the prices provided by the contract, and the clear preponderance of the evidence is, in our opinion, that it was within the appellant's power to increase the quantity (10,000 sheets) "at these rates," viz., the rates provided in the contract, and that the overcharges for the steel actually furnished by appellant to the appellee, figured at the contract rates, would make a larger amount by $19.36, as we figure it, than the amount claimed. The evidence of appellee also shows that at a time before the commencement of the suit, the defendant and his bookkeeper made a computation of the alleged overcharges which substantially agreed with the claim now made by the appellee.

It is also claimed by appellant that there was a mistake in the contract as to the prices at which sheet steel were to be furnished by him, and that the appellee, acting through its general manager, Laughlin, acknowledged this mistake when it was discovered, and thereafter, by mutual agreement between appellant and appellee, this mistake was corrected, so that instead of charging, as provided by the contract, $1.30 per 100 pounds for freight beams, and $1.40 per 100 pounds for locomotive and passenger beams, these figures were just transposed.

As to both the amount of the overcharges and the alleged mistake in the contract and its correction, it seems sufficient to say, as is the fact, there is a sharp conflict in the evidence, and we are not prepared to say but that the verdict of the jury is sustained by the weight of the evidence.

The next point is as to the matter of $1,000 for commission or profits, which, it is claimed by appellee, was received by appellant on the purchase of 500 tons of steel from the Wheeling Steel & Iron Co. As to this item, appellant's counsel claim that there can be no recovery, both because

of the alleged invalidity of the two contracts between appellant and appellee hereinabove referred to, and because, by the declaration, this claim is based on the contract of January 1, 1897. We have disposed of the question of the illegality of the contracts. The other contention we think is not tenable.

The contract for the purchase of this steel was made in November, 1896, and two deliveries of it were made during that month and the remaining deliveries during 1897. The money from the profits or rebates on this transaction was received by appellant during 1897, except one item of $216.56, which appellant received on December 12, 1896. In so far as appellee's right of recovery may be said to be based upon the contract of November 25, 1895, by reason of the provision in that contract which made it appellant's duty to provide the necessary material that might be required by the appellee in its business " on the best terms possible," the first and second counts constitute a sufficient pleading to justify the recovery to the full amount of the claims made.

If appellee's right of recovery can be said to be based upon the contract of January 1, 1897, which has a similar provision to the other contract, because of the deliveries made and the profits or rebates received by appellant, then the third and fourth counts are sufficient pleadings to justify the recovery as to all the deliveries made and money received on this transaction during 1897. The employment of appellant as appellee's agent is alleged in each of these four counts under a *videlicit*, and a careful reading of them shows that they are so framed as to cover this transaction, although, upon a casual reading, it may be said that the first two counts relate only to the overcharges as hereinabove mentioned, aggregating $1,312.50, for steel purchased wholly in 1896, which does not appear to have been purchased from the Wheeling Co. The gist of each of the four counts is the wrongful act of the appellant in procuring the sale to appellee of steel at a price beyond "the best terms possible," and the other matters specifically set out

may be considered as mere inducement. The duty of appellant and his obligation to plaintiff under each of the contracts is the same, and we think it clear from the proof that his violation of the contracts is established beyond question. In fact, the record shows that he admitted the liability in an affidavit made by him to set aside a default and judgment which was rendered in the early progress of the case.

A claim by appellant that the court erred in giving instruction numbered 3, quoted in the statement, which permits a recovery under the contract of January, 1, 1897, for this item, is not tenable. If, strictly and technically, the instruction is erroneous, it is, in our opinion, without prejudice, for the reasons above stated.

A further claim by appellant is made with regard to certain brake beams, 3,740 in number, which it is charged by the appellee in the fifth and sixth counts, were defectively manufactured under the superintendence of appellant, and an amount of $325 paid by appellee for certain No. 3 Christie special heads at the instance of appellant, as set out in the seventh count, which, it is alleged, was a clear loss to appellee.

These brake beams were manufactured in 1897, and the Christie special heads were purchased during the same year while appellant was working under his contract of January 1, 1897. By that contract appellant's duty was to cause the work done on the brake beams to be done efficiently, promptly, and to the satisfaction of appellee, and at the least possible cost to it, and he will transact the business in the manner required by the appellee; also, it was his duty to maintain the then present high standard of workmanship and material employed in the manufacture of said beams.

It appears from the evidence that brake beams to the number of 3,740 were manufactured under the superintendence of appellant which were defective in that the mandrel, a device used in their manufacture, consisting of a piece of steel around which the parts of the brake beams were

pressed, became worn, reduced in size by the constant use and friction, so that the beams thus manufactured were of no use as brake beams.    On this point, however, there is a sharp conflict in the evidence, which is very voluminous, and to state even the substance of it would greatly extend this opinion.    We have carefully read and considered it, and think that the verdict of the jury in making an allowance for this claim, can not be said to be clearly and manifestly against the evidence.    The appellee's evidence, besides making a *prima facie* case as to these defective beams, and that it was appellant's fault (which is not overcome by the appellant's evidence), also shows that it suffered a loss of $2,980 by reason thereof, and an additional sum of $325 for certain Christie special heads, which were ordered by appellant for appellee, and proved a loss to it of that amount. There is evidence on behalf of appellant tending to show that appellee offered to settle this matter for a much less amount, and that appellant at one time offered to take the defective beams in question from appellee, agreeing to dispose of them outside of the United States, so as to avoid loss thereon, which offer was rejected, because, at the time of the offer, the beams had been " scrapped;" but when it is all considered we can not say the allowance of the claim was not justified.

It is also said by appellant that the amount of this claim should, in any event, be reduced by the value of the material in the defective beams.    There is no evidence to sustain this contention.    The evidence on behalf of appellee shows that the defective beams were worthless as such, and there is no evidence in the record to show what, if anything, was the value of the material in them.

As bearing on this claim, appellant contends that evidence of the witness, Crane, was erroneously admitted, because it related to alleged defective beams claimed to have been returned by different customers of appellee prior to the year 1897. . We think this claim is untenable, for the reason that it does not appear clearly from the testimony of this witness that the beams of which he testified were not a

part of the beams in question. And even if he did refer to beams manufactured prior to 1897, still we think the error should not be considered as sufficient to reverse.

As bearing on this claim, appellant contends that instructions numbered four and five, quoted in the statement, are erroneous, since they, in effect, as is claimed, tell the jury there may be a recovery on account of the alleged defective beams, because they were not manufactured to the satisfaction of the plaintiff. We think these instructions are not fairly subject to this criticism. They only allow a recovery, as we construe them, upon a showing by the evidence that the beams were rendered unfit for brake beams by reason of their defective manufacture. Moreover, it is well settled that the instructions in a given case must be considered as a series, and if, when so considered, they fairly and fully instruct the jury as to every material fact in controversy, they will be considered sufficient. R. R. Co. v. Bannister, 195 Ill. 48, and cases cited.

The instructions, considered as a whole, we think fulfill this requirement. And by instructions given on behalf of appellant the jury were in effect told that it was incumbent upon the appellee to prove every material issue of fact essential to a recovery by a preponderance of the evidence, and on a failure so to do as to any material fact alleged, there could be no recovery. We think the jury were not misled by these instructions.

It is also said that the court erred in receiving in evidence certain records of the appellee company relating to the discharge of appellant, which contains a long and prejudicial report relating to him. It is sufficient answer to this claim that no exception to the court's action in that regard was preserved.

Considerable evidence was offered on behalf of appellee under the eighth, ninth, tenth and eleventh counts which, it is claimed, were not offered in good faith and for the express purpose of prejudicing appellant before the jury. We are at a loss to fully understand why evidence was offered under these counts, as it seems quite clear from appellant's evidence that

the matters therein claimed had been a subject of arbitration between the appellee and the Michigan Railway Supply Co., and that an award had been made including the items in question under these counts, with others which had been paid, all of which must have been known to appellee. We think the court should have instructed the jury that there could be no recovery under these counts, but we are inclined to the opinion that any error in this regard and any prejudice to the appellant by reason of the evidence in support of these counts, is obviated by a remittitur which the bill of exceptions shows includes the amounts of appellee's claims under these counts and interest thereon.

Claim is made that the court erred in giving instruction No. 7, quoted in the statement, in that it permits the jury to allow interest in an action of tort. We think that the instruction as to interest does not permit the jury to allow interest upon the item of defective brake beams, but only on moneys actually paid by the appellee because of the wrongful acts of the appellant. And we think it apparent, when the several amounts which we have held the jury were justified in including in the verdict are added to the interest at five per cent per annum upon the moneys actually paid out by appellee, the amount of the verdict is not too large. That interest is allowable on the moneys paid out, we think was proper under the statute. Chap. 74, Sec. 2, title, Interest.

Being of opinion that there is no reversible error in the record, the judgment of the Circuit Court is affirmed.